Filed 5/4/26  P. v. Gonzales CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>RICKY RANDY GONZALES,<br>        Defendant and Appellant. | C101626<br><br>(Super. Ct. No. 22FE003665) |

That defendant Ricky Randy Gonzales shot Jimmy C. several times was never in doubt; the question was whether Gonzales's actions were legally justified.  A jury rejected Gonzales's claim of self-defense and found him guilty of attempted murder, assault with a firearm, and being a felon in possession of a firearm.  Gonzales now claims several trial court errors require that we award him a new trial.  We disagree and affirm.

**LEGAL AND FACTUAL BACKGROUND**

Gonzales had a son with Loretta S.  Subsequently, Jimmy C. married Loretta and helped raise her son.  In addition to the son and two other children, Loretta and Jimmy also were raising Jimmy's 13-year-old daughter and Jimmy's 8-year-old sister.

On the day of the shooting, Loretta was planning a birthday party for her son.  She and Jimmy argued about money before she left the house on foot with three children.  While walking, Loretta called Gonzales.  Despite the fact that she had hardly spoken to Gonzales for over a decade, she asked him to meet them at a store called Citi Trends.

1

She told him she needed help with the party. She never told Gonzales she was afraid of anything.

When Gonzales arrived at the store, Loretta asked him to take the children to the car. Meanwhile, Jimmy had followed Loretta and was waiting in the Citi Trends parking lot in his SUV. He pulled up to Gonzales's parked sedan and started talking to him.

Loretta came out of the store and told Jimmy that she and the children were leaving with Gonzales. Jimmy told Gonzales that he was not taking his family. An argument ensued, and Jimmy indicated that his own sister should stay with him. Gonzales agreed that the sister could stay with Jimmy. Jimmy took his sister to his SUV and unsuccessfully tried to unlock the doors.

Jimmy then walked in front of his SUV, and he and Loretta were "getting loud with each other," but he never threatened anybody. Gonzales then shot Jimmy five times. Fortunately, Gonzales was a poor shot. Bullets struck Jimmy's elbow and upper chest, but he survived.

Gonzales, Loretta, and all of the children then quickly got into Gonzales's car and drove away. Loretta testified that she did not know that Jimmy had been shot, and Gonzales told her he fired his gun in an attempt to scare Jimmy. Gonzales drove to a family member's house in Stockton. Loretta testified that when she learned that Jimmy was in the hospital, she called the police and eventually cooperated.

Jimmy testified at trial that after he was shot, he walked quickly back to his SUV, opened the driver's side door, and leaned into the SUV, dripping blood on the front seat and cup holder. He then went to Citi Trends to get help and collapsed inside the store.

Gonzales admitted at trial that he fired his five-shot .38 Smith & Wesson revolver at Jimmy. Law enforcement found no casings at the scene; if the shooter used a revolver, no casings would be ejected. When Gonzales was arrested nearly three weeks later, he was in possession of a .40-caliber Beretta semiautomatic firearm. The parties appear to agree this Beretta was "a second gun" not involved in the shooting.

2

Jimmy testified at trial. Consistent with his testimony, Jimmy narrated a surveillance video that captured the shooting. He explained that once he was shot, he ran away. He then thought about driving himself to the hospital, and even went to his car to try and get inside to leave. He realized he was having trouble breathing and went to get help instead.

Jimmy repeatedly testified that he never had a gun or threatened anyone that day. Loretta also testified she never saw Jimmy with a gun and she had never seen Jimmy put a gun in the car or hide things in different places in the car.

Gonzales testified on his own behalf. According to him, Loretta called and said that she and the children were at Citi Trends in Sacramento and that someone was outside with a gun. Gonzales took a five-shot .38 Smith & Wesson revolver and drove from Stockton to Sacramento to help her.

Gonzales was by his car in the store parking lot when Jimmy pulled up in his SUV. Gonzales soon realized it was a domestic dispute and felt that Loretta had set him up. Gonzales had no ill will toward Jimmy.

The adults argued. Jimmy twice told Gonzales, "You're not leaving with my family." The two men started walking toward each other, and Gonzales saw Jimmy trying to draw a firearm from his waistline. It was a small-framed handgun; a semiautomatic, not a revolver. Gonzales pulled his own firearm and shot Jimmy before Jimmy could shoot him.

Gonzales discarded his Smith & Wesson on the drive back to Stockton, throwing it out the car window.

When officers first arrived at the scene of the shooting, they investigated the possibility of two shooters, and that Jimmy may have been one of them. Deputy Matthew Tam spoke to Jimmy briefly, who indicated he was shot by his wife's former partner. Jimmy denied he had a firearm and gave Deputy Tam permission to search his SUV. Deputy Tam looked around and inside Jimmy's car and found no clear signs of

3

hidden compartments where a firearm could be stashed. Deputies Jonathan Nelson and Renny Rojo also searched Jimmy's SUV but did not find a weapon.

Deputy Tam also testified that he followed a blood trail indicating Jimmy's path after he was shot. Although there were few areas where a gun could be hidden, he had other deputies canvass the area for additional guns; none were found. After viewing the surveillance video that captured the shooting, however, officers jettisoned the working assumption of more than one shooter and focused on the theory that Jimmy was an unarmed victim.

The jury found Gonzales guilty of attempted murder (Pen. Code,[1] §§ 664/187, subd. (a); count one), assault with a firearm (§ 245, subd. (a)(2); count two), and felon in possession of a firearm (§ 29800, subd. (a)(1); count three). The jury also found true firearm enhancement allegations: that during the commission of count one, Gonzales discharged and used a handgun pursuant to section 12022.53, subdivisions (b), (c), and (d) and that during the commission of counts one and two Gonzales used a handgun pursuant to section 12022.5, subdivision (a).

In a bifurcated proceeding, the trial court found true a prior strike and prior serious felony allegation. The trial court also found true several factors in aggravation.

Defense counsel filed a motion for a new trial and requested that the court unseal jury information, alleging that the jurors may have received extrajudicial evidence. The trial court held a hearing on whether to disclose juror identifying information but ultimately denied the request.

The trial court sentenced Gonzales to an aggregate term of 24 years four months, plus 25 years to life.

Gonzales timely filed a notice of appeal.

---

[1]     Undesignated statutory references are to the Penal Code.

## DISCUSSION

*I.*

*Deputy Tam's Testimony*

At trial, Gonzales's defense was one of self-defense. He contended that Jimmy had a gun that day and that Jimmy hid the fact that he was armed by either hiding or abandoning his weapon after he was shot, likely inside his own vehicle.[2] Whether Jimmy "had a firearm was the heart of the defense's self-defense argument and the lynchpin of the jury's decision." Gonzales contends that the court erred in allowing Deputy Tam to testify that the surveillance video showed Jimmy did not have anything in his hand after the shooting, thereby implying the shooting was not in self-defense. He specifically argues that if Deputy Tam's testimony was offered as lay opinion testimony, it was speculative and if his testimony was offered as an expert opinion, it was improper because it was not about a matter outside the scope of the jury's common experience. We need not resolve the issue however, as we conclude any error was harmless.

A. Additional Background

Deputy Tam testified he responded to a report of the shooting at Citi Trends. Deputy Tam narrated the surveillance video played for the jury and pointed out the moments where the shooter fired at Jimmy. Deputy Tam scrutinized the video to see if there were any signs that Jimmy was armed with a firearm. At one point, after Jimmy had been shot, he appeared "to grab something out of the vehicle," which Deputy Tam assumed was a cell phone. After the trial court sustained the defense's objection to Deputy Tam's assumption, the following exchange took place.

---

[2] To that end, a defense expert testified that the type of SUV Jimmy was driving has a large space under the cup holders in the console where items can be stored. Deputy Tam testified he looked around the front driver's seat and center console area for hidden compartments and found none but admitted there could have been a hidden compartment. Deputy Rojo testified that when he searched the SUV, he did not find anything in the cup holders. Deputy Nelson said he did not search the SUV for hidden compartments.

"[PROSECUTOR:] Based on your training and your experience why did you think something was coming out of the car and not something was going into the car?

"[DEPUTY TAM:] The motion in which he reached inside.

"[DEFENSE:] Objection, Your Honor. It's speculation.

"THE COURT: Overruled. [¶] … It's based on his training and experience.

"He can answer that.

"[DEPUTY TAM:] So based on my training — There's certain motions that people make.

"If they're dumping a firearm in — inside of a vehicle, they would have reached further in and probably stuffed it somewhere.

"I've found firearms — multiple firearms inside glove boxes. I've found them in between the driver's seat and center console. I've found them behind panels of dashboards.

"They're usually hidden. They don't just drop firearms on a seat and run.

"This case, his motion on the seat appeared to him — appeared to be the victim reaching into the vehicle and grabbing something from the vehicle and then shutting the door behind him.

"Um, the other thing I noticed in this vehicle is —if you rewind it just a bit, *his hands are empty prior to approaching the vehicle*." (Italics added.)

Deputy Tam then narrated a portion of the video pointing out "where [Jimmy] approaches the vehicle *with empty hands* and appears to grab something out of the vehicle." (Italics added.)

B. Analysis

Under Evidence Code section 720, subdivision (a), "[a] person is qualified to testify as an expert if he has special knowledge, skill, experience, [or] training" on the subject to which his or her testimony relates. The general test for the admissibility of expert testimony is whether it concerns "a subject that is sufficiently beyond common

6

experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); see also *People v. Rodriguez* (2014) 58 Cal.4th 587, 639.) In addition, a lay witness may express an opinion based on his or her perception where it is helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800; *People v. DeHoyos* (2013) 57 Cal.4th 79, 130.)

We review evidentiary rulings for abuse of discretion, and even if there was an abuse of discretion we do not reverse unless there is a reasonable probability the defendant would have achieved a more favorable verdict had the court ruled differently. (*People v. DeHoyos, supra*, 57 Cal.4th at p. 131; see also *People v. Watson* (1956) 46 Cal.2d 818, 837.)

We begin by noting two things. First, neither party commits to a position on whether Deputy Tam's testimony was admitted as lay or expert opinion testimony. Indeed, the trial court did not expressly state whether Deputy Tam's testimony was admissible as an opinion from a lay or expert witness or both. And, while the jury was instructed with CALCRIM Nos. 332 (Expert Witness Testimony) and 333 (Opinion Testimony of Lay Witness) neither instruction expressly informed the jury to consider Deputy Tam's testimony as either expert or lay opinion. In general, it is not improper for an officer to testify about observations made when reviewing a surveillance tape. (*People v. Son* (2020) 56 Cal.App.5th 689, 696-698.) But, as evident from the law cited *ante*, the analysis is different depending on how the evidence was admitted. We are of the view that some aspects of Deputy Tam's testimony could have been appropriately admitted as lay opinion and other aspects as appropriate expert opinion. But where, as here, there is no clear ruling on the foundation of the admissibility of the evidence, our review would necessarily be speculative.

Second, the People contend Gonzales forfeited his challenge to Deputy Tam's testimony on the basis that it was improper opinion or that it lacked relevance because his

7

trial objection was only based on speculation. We need not resolve either issue, however, because in addressing prejudice we find that any error was harmless for several reasons.

To the extent the jury relied on CALCRIM Nos. 332 and/or 333 in assessing Deputy Tam's testimony, both instructions informed it that evidence of expert and lay opinions must be considered but need not be accepted as true or correct. And regardless of whether the jury relied upon those jury instructions, the jury saw the video and was always free to compare the video to the deputy's opinion and determine for itself whether his opinion was correct. (See *People v. Leon* (2015) 61 Cal.4th 569, 601 ["because the surveillance video was played for the jury, jurors could make up their own minds" as to whether the video matched the testimony of the officer].)

The video clearly shows Jimmy was not holding a firearm when he returned to the SUV and thus Deputy Tam's testimony did not inform the jury of anything it could not see for itself. Nor did allowing Deputy Tam to opine that Jimmy was removing rather than depositing something inside the SUV usurp the jury's function as a fact finder. Because the video clearly shows Jimmy's hands were empty when he reached inside the car, there was nothing for Jimmy to deposit inside the vehicle and Deputy Tam's opinion on this point was wholly unnecessary to the jury's determination of whether Jimmy was armed.

Lastly, the evidence at trial supporting guilt was strong. While Gonzales testified that Jimmy had a firearm, other witnesses denied seeing Jimmy with a gun or a weapon. No other firearms were found on Jimmy or at the scene of the shooting. Furthermore, we are unpersuaded by Gonzales's contention that it was not apparent from the video whether Jimmy had a gun in his hand at the time of the shooting. As we have mentioned, in our viewing of the video it clearly shows Jimmy did not have anything in either hand when he returned to his car following the shooting. The video shows Jimmy return to his car after he was shot. His hands are visible and empty of any item, much less a firearm. Jimmy used one single hand to open the car door and reach inside. His other hand

8

remained at his side and did not enter the car. This action dispels any notion that he was placing a firearm inside the car, as it would have been difficult if not impossible to hold a firearm and open the car door with the same hand. The video depicts no such encumbered maneuver or item in his hand. The video of the shooting thus corroborated the evidence that there was only one shooter — Gonzales. There is no reasonable probability the result at trial would have been different absent Deputy Tam's narration of the video. In view of all the evidence presented at trial, any assumed error was harmless.

## II.
### Evidence of Other Firearm Possessions

Gonzales contends the trial court erred in admitting three facts about Gonzales's firearm possession: (1) when he was arrested three weeks after the shooting, he was in possession of a second firearm not used in shooting Jimmy; (2) that he "walk[ed] around armed all the time"; and (3) that he acquired both firearms illegally. According to Gonzales, this evidence constituted irrelevant character evidence, inadmissible under Evidence Code sections 352 and 1101. We agree the evidence was admitted in error but find the error harmless.

### A. Additional Background

Prior to trial, defense counsel requested that the court exclude any mention that Gonzales was typically armed with a firearm and asserted that he planned to stipulate to the fact that he was armed the day of the shooting. The court said, "I see this as you can't put on character evidence to say 'Yeah, I know this guy and he carries all the time.' " The prosecutor stated that she had no objection. The court excluded evidence that Gonzales was typically armed with a firearm.

Defense counsel also requested exclusion of evidence as to how Gonzales acquired the firearm used in the shooting. He admitted it was relevant that the firearm was possessed illegally but asserted *how* he obtained it was not. The court said, "Yeah. I tend to agree. He's admitting to the prior and so — Okay. I'll grant that."

9

Defense counsel later stated that he wanted to make sure "there was no [Evidence Code section] 1101[, subdivision ](b) evidence" in light of a notation regarding an illegal firearm possession. The prosecutor stated she had no "1101(b)" evidence at that point.

After the People rested but before Gonzales took the stand in his own defense, a new prosecutor[3] indicated he intended to raise the fact that Gonzales had a firearm in his possession when found by police three weeks after the shooting. The prosecutor never suggested this firearm was used in the shooting. Rather, the parties below and on appeal appear to agree this Beretta was "a second gun" and not involved in the shooting. Defense counsel objected, stating that he previously requested the exclusion of any evidence that Gonzales was armed at any time other than the shooting, as it was not relevant to the instant offense. The trial court found the fact that Gonzales was armed with a gun when he was arrested was relevant and admissible. The court stated that if it ruled differently in limine, then "I'm just reversing myself I guess." The trial court reiterated that the prosecution could not elicit testimony that Gonzales was someone who generally walks around carrying firearms.

On cross-examination, the prosecutor asked Gonzales where he obtained the gun used in the shooting. Gonzales admitted he bought it a week or two before the shooting from an illegal source. He explained, "I still got people out there that want to do me harm, too." The prosecutor also asked Gonzales, "So the day this shooting happened, did you — were you already armed? [¶] *Did you just walk around armed all the time*?" (Italics added.) Gonzales answered "Yes, I did."

Toward the end of cross examination, the following exchange took place between the prosecutor and Gonzales.

---

[3] On the sixth day of trial, the original prosecutor was called away on an emergency basis and a new prosecutor was assigned.

"[PROSECUTOR:]  After all this happened, they catch — when — when they find you — By the way, this was March 17th.

"Does that sound about right?

"[GONZALES:]  Yes.

"[PROSECUTOR:]  And in this period of time — Between when the shooting happened and March 17th, it sounds to me like you're saying — First of all, you got another illegal gun?

"[GONZALES:]  Yes, sir.

"[PROSECUTOR:]  Where did you get that one?

"[GONZALES:]  Probably the same place."

Defense counsel did not immediately object to the question of whether Gonzales walked around armed all the time or how he acquired the firearms.  After the testimony and outside the jury's presence, defense counsel objected and explained that he did not make a contemporaneous objection because he did not want to highlight the issue to the jury.  The trial court faulted defense counsel for waiting to object and found that any issue as to how Gonzales came to possess the firearms was waived by counsel's failure to object.

After the close of evidence, the court denied defense counsel's motion for a mistrial on this claim of error.  However, the court agreed that allowing the introduction of evidence as to how Gonzales obtained firearms violated its ruling made in limine.  With the parties' agreement, the trial court instructed the jury that "[a]ny questions and any resulting testimony about how the defendant obtained any weapons in this case are stricken from the record and you may not consider such questions or testimony in any way during your deliberations."

B.  Analysis

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code,

§ 210.) "Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. (Evid. Code, § 1101.)" (*People v. Foster* (2010) 50 Cal.4th 1301, 1328; accord, Evid. Code, § 1101, subd. (b).)

Trial judges have discretion to exclude relevant evidence where its probative value is substantially outweighed by the probability that admitting the evidence will unduly prolong the proceeding, prejudice the opposing party, confuse the issues, or mislead the jury. (Evid. Code, § 352; *People v. Linton* (2013) 56 Cal.4th 1146, 1181.) However, evidence is prejudicial not because it is damaging to a defendant's case, but because it " ' "uniquely tends to evoke an emotional bias" ' " without regard to its relevance. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) We review the trial court's rulings on the admissibility of evidence for abuse of discretion. (*Linton*, at p. 1181.)

The People contend that Gonzales forfeited his challenge to the firearm evidence by failing to make a timely objection in the trial court on the ground raised on appeal. Anticipating the People's forfeiture argument, Gonzales makes a preemptive ineffective assistance of counsel claim. We conclude Gonzales did not forfeit the claimed error. He filed motions in limine regarding the propriety of the evidence and discussed the applicability of both subdivision (a) and (b) of Evidence Code section 1101 to the case. Counsel also objected to the relevant testimony. Although the objection took place outside the presence of the jury, this is a recognized tactic to " 'efficiently dispose of matters outside the hearing of jurors or testifying witnesses.' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1123.)

We agree with Gonzales that the highlighted evidence was improperly admitted. By asking whether he always walked around armed, the prosecutor violated the court's

12

pretrial exclusion order. And it was irrelevant. Notably, Gonzales did not deny he had a gun or used it to shoot Jimmy, nor does he claim such on appeal. His position was and is that he used the gun lawfully in self-defense. Similarly, his possession of an unrelated firearm three weeks after the shooting was therefore not relevant to whether he shot Jimmy or acted in self-defense.

Similarly, the fact that Gonzales obtained both firearms illegally was irrelevant to the contested issues as well. As Gonzales notes, the potential value in this evidence for the prosecution was to portray him as having a predisposition to engage in armed criminality, in flagrant disregard of the law, regardless of the relevant circumstances. Admission of this evidence was erroneous. (Cf. *People v. Barnwell* (2007) 41 Cal.4th 1038, 1056 ["[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons" and cannot be relied upon to prove propensity or disposition]; see also *People v. Henderson* (1976) 58 Cal.App.3d 349, 360 ["Evidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons — a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant"].)

The People alternatively contend that the evidence " 'had very little effect on the issues' " and thus any error was harmless. Disagreeing, Gonzales claims the evidence was so inflammatory and prejudicial that its admission violated due process such that it cannot be said to be "harmless beyond a reasonable doubt" — as set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. But the admission of evidence only results in a due process violation when " 'there are no permissible inferences the jury may draw from the evidence,' " such that its admission rendered the trial fundamentally unfair. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229; see *People v. Hunt* (2011) 196 Cal.App.4th

13

811, 817.) Here, the trial court expressly instructed the jury to disregard "[a]ny questions and any resulting testimony about how the defendant obtained any weapons in this case" as they were stricken from the record and could not be considered. We presume the jury followed the instruction. (*People v. Chhoun* (2021) 11 Cal.5th 1, 30.) And the evidence that Gonzales was frequently armed, including weeks after the shooting, could allow the jury to permissibly infer that Gonzales had a need for self-defense, as explained by his testimony. Thus, the evidence did not render the trial fundamentally unfair. We conclude no due process violation occurred and *Chapman* does not apply.

Instead, "state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439; see *People v. Watson, supra*, 46 Cal.2d at p. 836.) Under this test, Gonzales has not demonstrated prejudice. The objectionable evidence was far from a bombshell. As part of his own defense Gonzales essentially told the jury he was well-prepared to illegally arm himself at a moment's notice in anticipation of trouble. As noted, Gonzales admitted he illegally owned and carried his Smith & Wesson to Citi Trends after Loretta called him and that he used it to shoot Jimmy multiple times. We also note that the prosecutor did not mention the second firearm possession at all during closing arguments.

Even if the objectionable evidence led the jury to infer Gonzales was predisposed to commit armed violence, this does not necessarily mean the verdict was based on this inference. Indeed, it is hard to conceive how the evidence regarding how often Gonzales was armed could influence the verdicts of guilt on the attempted murder or assault charges when the jury actually saw the shooting unfold on the video. The video speaks for itself. The jury could see Gonzales shoot Jimmy multiple times and could judge for itself Gonzales's claim that he only shot Jimmy in self-defense. The video corroborated the eyewitness testimony that pointed to Gonzales as the sole shooter. Thus, the strength

14

of the evidence of Gonzales's guilt makes it exceedingly unlikely he would have received a more favorable verdict had the trial judge excluded the evidence of how often he was armed, the fact that he was armed three weeks after the shooting, and/or how he obtained the illegal firearms. Especially compared to the video, the objectionable evidence was not of such a nature that " ' "uniquely tends to evoke an emotional bias" ' " without regard to its relevance. (*People v. Kipp, supra*, 26 Cal.4th at p. 1121.)

*III.*
*Late Discovery of Body Camera Footage*

After trial began, the prosecutor discovered footage from an officer-worn body camera that recorded officers searching Jimmy's SUV after the shooting. This evidence tendered as late discovery was labeled *People's exhibit 3*. On appeal, Gonzales claims that the late discovery of the footage, which he identifies as *defense exhibit G*, was prejudicial to his case and should have prompted the trial court to instruct the jury with CALCRIM No. 306 (Untimely Disclosure of Evidence). He contends that the court erred in refusing to do so and trial counsel was ineffective for failing to renew the instructional request. We disagree with his claims.

A. Additional Background

The state of the record as to what evidence was "late discovered" is confusing. On February 7, 2024, after the prosecution presented its first witness, the prosecutor noted that she just received notice that body-worn camera footage was discovered. Defense counsel accepted the prosecutor's representation that the footage would be forthcoming.

The next day, on February 8, defense counsel premarked three video exhibits: defense exhibits G, H, I, along with their respective transcripts, and described all of them as footage from Deputy Tam's body-worn camera. Gonzales's final exhibit list contained those same exhibits and descriptions.

On February 13, the prosecutor informed the court that he tendered the previously missing footage (the "late discovered" evidence) to defense counsel a few days prior. As

15

described by the parties, the footage showed an officer searching the front passenger compartment area of Jimmy's SUV.[4]  Once defense counsel received the evidence, he requested the court instruct the jury with CALCRIM No. 306 on the untimely disclosure of evidence.  The court denied the request.  Notably, defense counsel did not ask to exclude the evidence.

The prosecutor noted that he planned to play a clip of People's exhibit 3 but that he would do so without sound because he did not have an accompanying transcript.  The prosecutor then stated, "there is a portion after that, where they are chatting amongst themselves about were there two guns, the guys were shooting at each other."  Defense counsel did not object or indicate that he had a transcript for this exhibit, which had only been discovered a few days prior.

During Deputy Nelson's testimony, the prosecutor and defense counsel both played the same clip from People's exhibit 3, without sound.[5]  Deputy Nelson confirmed it was video footage from his body camera.  The next day, during Deputy Rojo's testimony, defense counsel played defense exhibit G for Deputy Rojo, which is body camera footage from an officer sitting in a car, speaking to another officer who is off screen.  The two officers discuss the possibility of multiple shooters.  The transcript of this video attributes the conversation to be between Deputy Tam and Deputy Rojo.  But Deputy Rojo testified he was not involved in that conversation.  He stated that the voices sounded like Deputy Tam speaking with Deputy Ken Lloyd.

---

**4**     Although People's exhibit 3 was footage initially attributed to Deputy Rojo's body camera, Deputy Nelson testified the footage was from his body camera and recorded his search of Jimmy's SUV with Deputy Rojo.

**5**     Because the prosecution only introduced a four-minute clip, the clipped portion was copied and admitted as People's exhibit 4.

In briefing on appeal, Gonzales argues that the prosecution untimely provided a body camera video of the search of Jimmy's SUV, wherein the officer indicated that a witness said the victim shot first. In doing so, he refers to defense exhibit G-1, the transcript of the video footage contained in defense exhibit G. From our review of the record, the "late discovered" evidence was People's exhibit 3, not defense exhibit G. If defense exhibit G is part of People's exhibit 3, there is no record of such.

B. Analysis

Discovery in criminal cases is strictly governed by sections 1054 to 1054.10. These provisions are "the only means by which the defendant may compel the disclosure or production of information from prosecuting attorneys … ." (§ 1054.5, subd. (a); see *People v. Tillis* (1998) 18 Cal.4th 284, 294 [courts may not broaden scope of discovery mandated by these provisions].)

In criminal cases, the prosecutor must disclose "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case … which the prosecutor intends to offer in evidence at the trial." (§ 1054.1, subd. (f).) These disclosures must be made at least 30 days before trial. (§ 1054.7.)

If a party fails to comply with these disclosure requirements, "a court may make any order necessary to enforce the provisions of this chapter." (§ 1054.5, subd. (b).) The court has broad discretion to fashion a remedy in the event of a discovery violation. (*People v. Jenkins* (2000) 22 Cal.4th 900, 951.) As one choice of remedy, a trial court may give the jury a special instruction regarding late disclosure of evidence. (*People v. Riggs* (2008) 44 Cal.4th 248, 306.) A trial court's ruling on matters concerning discovery is generally reviewed under an abuse of discretion standard. (*People v. Lamb* (2006) 136 Cal.App.4th 575, 581.)

17

Because Gonzales's claim of prejudice rests on his contention that defense exhibit G was part of the late discovery, his inability to connect defense exhibit G to People's exhibit 3 is fatal to his claim.

In addition, Gonzales cannot prevail without affirmatively showing error in the trial court's decision to not instruct the jury with CALCRIM No. 306. (*People v. Riggs, supra*, 44 Cal.4th at p. 306; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564). Even were we to assume the trial court erred in failing to instruct the jury on CALCRIM No. 306, we find no prejudice resulted. Contrary to Gonzales's claim, the instruction would not have been helpful here. CALCRIM No. 306 instructs the jury that both sides "must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial." The instruction also provides an opportunity to identify the evidence and party at fault before further instructing, "In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure." (CALCRIM No. 306) While the instruction would have informed the jury that an untimely disclosure was made, it would not have made a significant difference in this case.

Given the nature of the trial evidence, it is difficult to see that the late disclosure of People's exhibit 3 (which showed Deputies Nelson and Rojo searching the SUV) had any effect on the trial or in the jury's assessment of Gonzales's guilt. The fact that officers discussed reports that Jimmy fired the first shot or that there may have been two shooters was not new information. Deputy Tam testified that he initially investigated the shooting as involving more than one shooter and that the shooting was possibly instigated by Jimmy. The jury also heard defense exhibits H and I, Deputy Tam's body camera footage, in which that same possibility was discussed.

Gonzales additionally argues that the body camera footage of the officers searching Jimmy's car would have added support to his argument that the officers

18

committed missteps in the course of investigating this case. He goes on to contend that "it is reasonably probable that the jury could have decided that untimely discovery had impacted the defendant's ability to investigate and that this raised a reasonable doubt as to appellant's guilt." Yet Gonzales does not tell us *how* the late discovery of this specific evidence deprived him of the ability to investigate or of putting forth a claim of self defense. " '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

As a result, it is unclear how Gonzales was demonstrably prejudiced by the court's failure to instruct the jury pursuant to CALCRIM No. 306. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 679 ["In determining whether the failure to instruct requires reversal, '[w]e apply the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given' "].)

Nevertheless, Gonzales argues that discovering that defense exhibit G recorded a conversation between Deputies Tam and Lloyd (rather than Rojo) was "precisely the type of setback to the opposing party which may transpire through the late disclosure of evidence." We are not persuaded. Defense counsel premarked defense exhibit G on the second day of evidence and, as we have concluded, there is no indication this was tendered as part of the late discovery of People's exhibit 3. Accordingly, Gonzales cannot show that the prosecution bears any responsibility for counsel's surprise that it was not Deputy Rojo who was conversing with Deputy Tam on defense exhibit G.

Gonzales's final claim is that his counsel rendered ineffective assistance when he failed to renew his request for the instruction or request other remedies for the People's delayed production of discovery. A defendant claiming ineffective assistance of counsel must show both deficient performance under an objective standard of professional

19

reasonableness, and prejudice under a test of reasonable probability of a different outcome. (*People v. Jones* (1998) 17 Cal.4th 279, 309.) A reasonable probability is "a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim on appeal must be rejected. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

Gonzales contends that the late discovery resulted in counsel's failure to investigate Deputy Lloyd, the person who purportedly told Deputy Tam that a witness said Jimmy fired first. But the record sheds no light on whether defense counsel did or did not investigate Deputy Lloyd or whether he pursued other avenues to discover the identity of the witness. Such a claim raises matters outside the record on appeal and should therefore be resolved in a habeas corpus proceeding where evidence can be submitted in support of the claim. (*People v. Barella* (1999) 20 Cal.4th 261, 272.) And, because we have already rejected Gonzales's claim that he was prejudiced by the court's failure to instruct the jury on CALCRIM No. 306, we conclude he has not established that he was prejudiced by counsel's failure to renew his request for the instruction.

*IV.*
*Cumulative Error*

Gonzales contends that the cumulative effect of the errors he alleges prejudiced him, mandating reversal. We reject this contention. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless when taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176.) A defendant is "entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) Gonzales was not deprived of a fair trial. Although we have

20

found the trial court erred by admitting extraneous evidence regarding Gonzales's possession of firearms, Gonzales was able to argue his defense. In light of the substantial evidence of his guilt, there is no reasonable probability that with the correct rulings the outcome of Gonzales's case would have been more favorable to him.

*V.*
*Juror Information*

Gonzales contends the trial court abused its discretion by refusing to release juror information when Gonzales presented evidence that officers had spoken about the merits of the case in front of jurors. We disagree.

A. Additional Background

Defense counsel filed a motion for a new trial based on allegations from Gonzales's friend, Richard VanBoeyen, that the jurors in Gonzales's case had "received prejudicial extrajudicial evidence from law enforcement officers in the hallway while the jury was present during a break within the court's proceedings."

Defense counsel noted that his investigator had been able to locate two of the 12 jurors, neither of whom were aware of any statements being made by the officers.[6] Counsel requested that the court either release the contact information of the remaining jurors or send letters to the jurors to inquire if they had been "privy to extra judicial statements in the hallway by law enforcement officers."

The court held a hearing on the motion to release juror information. VanBoeyen, who had several felony convictions, testified he has known Gonzales since grade school and was friends with and affiliated with the same gang as Gonzales. He also testified that on February 13, 2024, during a break in proceedings, he heard "three to four officers

---

[6]    The court previously continued the hearing to provide the defense an opportunity to attempt to contact jurors without the release of any information. The defense investigator spoke with jurors Nos. 1 and 7.

21

talking about [Gonzales], his prior history and his case in front of the jury." He claimed that the officers referred to Gonzales as "a criminal," "a thug" and commented "that there was no other firearm involved in the case." He acknowledged that he was only able to hear bits and pieces of what the officers were discussing in the hallway.

VanBoeyen admitted that he had previously spoken with defense counsel and not raised any concern. He claimed that he did not know that it was wrong for law enforcement officers to talk about the case outside of the courtroom. However, on cross-examination, VanBoeyen admitted he did not tell defense counsel about what he heard on the day that he overheard the officers talking. He later clarified that he had told Gonzales about what he overheard that same day, but that he did not say anything to defense counsel until the following day. VanBoeyen subsequently changed his testimony again and noted that he had not told defense counsel what he overheard until after the trial was over.

The trial court initially refrained from making any credibility determinations but said it would set the matter for another hearing and start the process of reaching out to jurors. The court noted that "[a]ny juror who says they are okay sharing their information, that information will be passed to Counsel." The court further noted: "Any juror who's not willing to do that, we'll take that up when we come back for the New Trial Motion, if either side thinks there's good cause to compel the disclosure of juror information, over their objection."

At the next hearing, the court noted that all the jurors had been contacted by mail. Two of the jurors responded that they were willing to release their information, and five responded that they objected to the release. The court clerk then reached out to the remaining jurors by phone. Over the course of two weeks the clerk placed three phone calls to the remaining jurors. Two additional jurors responded by phone opposing the release of their information. Three jurors never responded by phone or by mail. The

22

court noted that it would not be disclosing information related to the jurors who had said " 'No.' "

At the time of the hearing, two jurors (jurors Nos. 1 & 4) were present in court. Defense counsel noted that his investigator had already spoken with juror No. 1 and that she was unable to corroborate any of VanBoeyen's allegations. He did, however, ask that the court inquire from juror No. 4.

Juror No. 4 stated that she "was in the hallway most of the time with the witness[es]," but that the only thing that she overheard was "one officer asked another one … about getting the day off to come here or something logistical like that" and the officer's conversation "certainly wasn't case-related." Juror No. 4 acknowledged, however, that she was not necessarily there "all the time that the officers were in the hallway."

Defense counsel argued that he should have the opportunity to inquire from the other jurors. The court disagreed, finding, "I had one witness who I found not very credible. I have now … two jurors … saying they didn't hear anything. [¶] I had another juror saying she didn't hear anything." The court ordered the jurors' information sealed.

At a subsequent court date, the court explained that the prior motion for new trial was "recharacterized as motions for release of juror information." The court then found that to the extent that a motion for a new trial was made "based on juror misconduct," the court would deny such a motion.

B. Analysis

" 'A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors.' [Citation.] 'Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias.' [Citation.] Even a juror's 'inadvertent receipt of information that had not been presented

in court falls within the general category of "juror misconduct." ' " (*People v. Miles* (2020) 9 Cal.5th 513, 601.) A verdict reached by prejudicial juror misconduct must not be permitted to stand. (Pen. Code, § 1181, subds. 2, 3 & 4; Code Civ. Proc., § 657, subds. 1 & 2.) Trial courts have the inherent power to manage inquiries into juror misconduct. (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 385.)

Conducting these inquiries requires balancing a juror's right to privacy against a criminal defendant's right to a verdict uninfluenced by prejudicial juror misconduct and "a strong public interest in the ascertainment of truth in judicial proceedings." (*People v. Granish* (1996) 41 Cal.App.4th 1117, 1126.) Code of Civil Procedure section 237 provides guidelines as to how inquiries may be made into juror misconduct while protecting juror information. (*People v. Tuggles, supra*, 179 Cal.App.4th at p. 386.)

"Under Code of Civil Procedure section 237, in a criminal case, the trial jurors' 'personal juror identifying information' — defined as their names, addresses, and telephone numbers — must be sealed after their verdict is recorded. (Code Civ. Proc., § 237, subd. (a).) However, '[a]ny person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information.' (Code Civ. Proc., § 237, subd. (b); see Code Civ. Proc., § 206, subd. (g).)" (*People v. Johnson* (2013) 222 Cal.App.4th 486, 492; see *People v. Munoz* (2019) 31 Cal.App.5th 143, 165.) There is good cause to unseal the jurors' information when the petitioner establishes " 'a reasonable belief that jury misconduct occurred.' " (*People v. Cook* (2015) 236 Cal.App.4th 341, 345.)

If the trial court finds that the moving party made a prima facie showing of good cause, and if it finds no compelling interest against disclosure, it shall set the matter for hearing. (Code Civ. Proc., § 237, subd. (b).) The trial jurors are entitled to notice of the hearing, an opportunity to "protest the granting of the petition," and an opportunity to appear. (Code Civ. Proc., § 237, subd. (c).)

24

After the hearing on a petition, "the records shall be made available as requested in the petition, unless a former juror's protest to the granting of the petition is sustained. The court shall sustain the protest of the former juror if, in the discretion of the court, the petitioner fails to show good cause, the record establishes the presence of a compelling interest against disclosure as defined in subdivision (b), or the juror is unwilling to be contacted by the petitioner. The court shall set forth reasons and make express findings to support the granting or denying of the petition to disclose." (Code Civ. Proc., § 237, subd. (d).)

We review a trial court's denial of a petition to disclose juror information for an abuse of discretion. (*People v. Johnson, supra*, 222 Cal.App.4th at p. 492.)

We do not find an abuse of discretion here. VanBoeyen was the only person to purportedly hear the officers say Gonzales was a criminal, a thug, and that there was no other weapon involved in the shooting. However, the trial court found VanBoeyen was not credible and Gonzales has given us no reason to question that finding. (See, e.g., *Tom Thumb Glove Co. v. Han* (1978) 78 Cal.App.3d 1, 5 ["it is for the trial court to evaluate the credibility of witnesses [citation] and the judge may 'disregard the testimony of any witness, or the effect of any prima facie showing based thereon, when he is satisfied that the witness is not telling the truth or his testimony is inherently improbable due to its inaccuracy, due to uncertainty, lapse of time, or interest or bias of the witness' "].)

Even if we take VanBoeyen's testimony at face value, it fails to establish misconduct. Although he testified that *he* heard those statements, at no point did he indicate anything that suggests *a juror* heard any of the officers' comments. Indeed, three jurors indicated that they did not hear the officers speak about case related facts at all. While juror No. 4 heard some discussion as to whether an officer needed to take the day off to testify, this had nothing to do with the facts of the case or VanBoeyen's allegations. There is simply no basis to conclude there is a reasonable belief that jury

25

misconduct occurred.  A failure to make the required showing justified denying the request for disclosure.  In light of our conclusion, we need not address Gonzales's remaining arguments.

**DISPOSITION**

The judgment is affirmed.

/s/
EARL, P. J.

We concur:

/s/
MAURO, J.

/s/
MESIWALA, J.